THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF AN ELECTRONIC DEVICE, DESCRIBED IN ATTACHMENT A, SEIZED DURING THE EXECUTION OF AN ARREST WARRANT AT 147 MAIN STREET, WATERVILLE, ME 04901 | Case No. 2:23-cr-931 |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Hailey Barraco, a Special Agent with Immigration and Customs Enforcement, Homeland Security Investigations, United States Department of Homeland Security, being first duly sworn, depose and state under oath as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I have been a Special Agent with the United States Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) since April of 2019. I am currently assigned to the Assistant Special Agent in Charge, Charleston, SC, office. I am a graduate of the Federal Law Enforcement Training Center and the HSI Special Agent Training Academy. My responsibilities as a Special Agent include investigating crimes involving the importation and exportation of merchandise contrary to law, controlled substances, and child exploitation. I have become familiar with a variety of means through which individuals and entities import and export merchandise in violation of U.S. federal laws and the financial transactions supporting those illegal activities.

2. Prior to becoming a Special Agent, I was a Financial Crime Investigator (FCI) with the Florida Department of Financial Services (DFS) in Tampa, FL for approximately four years.

As an FCI, I worked cases related to welfare fraud and misuse of public benefits. While employed with DFS, I was a member of the United Counsel of Welfare Fraud.

3. This Affidavit is submitted in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property – an electronic device – which is currently in the possession of law enforcement, and the extraction from the electronic device of electronically stored information described in Attachment B, for contraband and evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 545; Title18, United States Code, Section 922 (a)(l)(A); and Title 18, United States Code, Section 922(g)(l).

4. Currently, your affiant is investigating the importation and attempted importation of a "firearm suppressor" or firearm silencer from China to the United States. The term "firearm" under 18 U.S.C. § 92l(a)(3) (and for purposes of 18 U.S.C. § 922(g)), is defined, in pertinent part, as "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon; any firearm muffler or firearm silencer; or any destructive device." Furthermore, the term "firearm silencer" under 18 U.S.C. § 921(a)(25) is defined, in pertinent part, as "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication."

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. I have set forth only the facts that I believe are

necessary to establish probable cause to believe that contraband and evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 545, importation of merchandise into the United States contrary to law; Title 18, United States Code 922 (a)(l)(A), unlawfully receiving any firearm in interstate or foreign commerce; and Title 18, United States Code, Section 922(g)(l), felon in possession of a firearm are presently stored in SUBJECT DEVICE.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

6.  The property to be searched was seized pursuant to a federal arrest warrant executed at 147 Main Street, Waterville, ME 04901. The device seized is a black iPhone, (the "SUBJECT DEVICE"). The SUBJECT DEVICE is currently located at 3950 Faber Place Drive, North Charleston, SC 29405.

7.  The applied for warrant would authorize the forensic examination of the SUBJECT DEVICE described in Attachment A for the purpose of identifying electronically stored data described in Attachment B.

## PROBABLE CAUSE

8.  On September 26, 2022, a United States Postal Service (USPS) Mail Parcel arrived at the JFK Mail Facility, tracking #: 9274890301722200011277709 6, being shipped to 164 Beret Street, Lot A, North Charleston, SC 29418 from China. The parcel was inspected by Customs and Border Protection (CBP) upon entry into the United States. The parcel was found to contain a firearm silencer.

9.  On October 13, 2022, HSI Charleston received the firearm silencer for further investigation into the party to whom it was addressed. JIMMY KING of 164 Beret Street, Lot A, North Charleston, SC 29418 was the individual listed on the shipping label. A photograph of the

shipping label on the parcel is provided below:



10. According to the South Carolina Department of Motor Vehicles (SCDMV) Jimmy Franklin KING JR resides at 164 Beret Street, Lot A, North Charleston, SC 29418. According to SCDMV, KING has three (3) vehicles registered to the address which include a 2002 Chevrolet Avalanche (No current plate listed), 1999 Mercedes SL500 (SC Plate: VLD374), and 2006 BMW X3 (SC Plate: UCJ312).

11. According to a law enforcement database, KING has received several shipments from China between October 2021 and September 2022 with descriptions such as "toy", "oil water separator", and "household tools." These descriptions were completed by the sender of the package as part of a bill of lading listing the contents of the packages. According to the same database, KING has also imported a professional aluminum alloy tactical stock and aluminum alloy red dot

sight scope that are used with various firearms. The tactical stock and red dot sight scope can legally be possessed by KING as they are not alone considered firearms. Based on my training and experience and discussions with CBP officers, CBP has seized silencers, Glock automatic switches, and narcotics where subjects have utilized descriptions like those above as a way to deter law enforcement from intercepting the packages as they enter the United States.

12. The package which was represented in the bill of lading to contain "household tools," is the same package found to contain the silencer, described in paragraph 8. The package did not contain household tools. While the bill of lading mistakenly contained the state "CA", the package was ultimately shipped to KING at 164 Beret Street, Lot A, North Charleston, SC 29418. The 29418 zip code—which was correctly stated on the bill of lading—corresponds to South Carolina, not California. The shipper was listed as Linlei Ye at Chinaguang Dong Shengshen Zhen Shi, Guangdong, Shen Zhen Shi, CN 518110. The package weighed 0.07 kilograms.

13. The "oilwater separator," referenced in paragraph 11, was shipped to KING at SUBJECT PREMISES by Shikang Li at Chinahubei Providencexiangyangfanche, Hubei, Xiangyang, CN 441000. The package arrived in the United States on August 29, 2022, and weighed 0.21 kilograms.

14. The "toy'" referenced in paragraph 11, was shipped to KING at SUBJECT PREMISES by Yfhexlogistics, No1xinfengroadxinliancommunityhumen, Dongguan, CN. The package arrived in the United States on August 19, 2022, and weighed 0.6 kilograms.

15. The "professional aluminum alloy tactical stock," referenced in paragraph 11, was shipped to KING at 164 Beret Street, Lot A, North Charleston, SC 29418 by Haung Sishuo, No805haitiangehailong, Huayuanfenghu, Shenzhen, CN, 518000. The package arrived in the United States on February 11, 2022, and weighed 0.2 kilograms.

16. The "aluminum alloy red dot sight scope," referenced in paragraph 11, was shipped to KING at 164 Beret Street, Lot A, North Charleston, SC 29418 by Peng Congyan at 5th floor, No21 Tianzhu Road, Guangdong, Shenzhen, CN 518110. The package arrived in the United States on October 25, 2021, and weighed 0.07 kilograms.

17. According to the South Carolina Department of Employment and Workforce (SCDEW), KING applied for unemployment insurance on January 19, 2022, utilizing the 164 Beret Street, Lot A, North Charleston, SC 29418. KING also submitted an address change from 406 Hunsford Street, Summerville, SC 29483 to 164 Beret Street, Lot A, North Charleston, SC 29418 on September 9, 2021.

18. On October 19, 2022, surveillance was conducted at 164 Beret Street, Lot A, North Charleston, SC 29418 and a white Mercedes was observed at the residence. The white Mercedes contained South Carolina license plate VLD374 which is registered to KING.

19. According to the National Crime Information Center (NCIC) KING was convicted of felony charges in 2009 for conspiracy to manufacture, possession with intent, distribution of methamphetamine and maintaining a residence for manufacturing methamphetamine. Thus, your Affiant is aware that KING has been convicted of a crime punishable by a term of imprisonment exceeding one (1) year, for which he has not received a pardon. KING is a felon for purposes of 18 U.S.C. § 922(g)(1) and is prohibited from possessing firearms and/or ammunition.

20. On November 3, 2022, a federal search warrant was executed at 164 Beret Street, Lot A, North Charleston, SC 29418. Agents seized short barrel rifles, pistols, a lower receiver, magazines, ammunition, empty casings, firearm parts and accessories, documents indicating KING resides at the residence, two 3D printers utilized to make firearms and firearm accessories, and electronic devices.

21.    On November 30, 2022, HSI Charleston obtained federal search warrants to search devices seized at 164 Beret Street, Lot A: an HP laptop, a CPU tower, a Logitech thumb drive, a Verizon ZTE cell phone, a blue iPhone, and a white iPhone. Computer forensic analysts were unable to access data on the cell phones. One phone had a shattered screen with no SD/SIM card, one phone was wiped and in set up mode, and the last phone was in restore mode. Since KING was not at the residence when the search warrant was executed, it is believed that KING had his primary phone with him. Agents were able to obtain data from a computer seized at the residence that contained evidence such as 3D printing software for firearms and firearm parts and online searches to tactical suppliers that sell gun parts. Agents were able to locate purchases to the same tactical supply store via KING'S PayPal records.

22.    On February 14, 2023, KING was federally indicted and HSI Charleston obtained a federal arrest warrant for KING. KING was likely made aware of the execution of the federal search warrant at 164 Beret Street, Lot A, and what was seized based on the copy of the search warrant and inventory left there. On September 29, 2023, KING was apprehended in the street right outside 147 Main Street, Waterville, Maine. KING had the SUBJECT DEVICE in his pocket and was wearing a backpack which contained two firearms.

23.    The firearms seized at 164 Beret Street, Lot A, North Charleston, SC 29418, referenced in paragraph 20, and the firearms in KING'S possession upon his arrest, referenced in paragraph 22, did not have serial numbers. Based upon this affiant's training, experience, and discussions with other federal agents, your affiant believes there will be evidence as to the origin of firearms and firearm accessories on SUBJECT DEVICE.

24.    Your affiant has participated in numerous investigations either as the investigating agent or as an assisting agent involving counterfeit items shipped from China. In every

investigation this affiant has been involved in, when the items have come from China, the orders were placed over the internet. This is due to many factors which include language barriers, time zone differences, and the fact that the internet is the most efficient way to advertise goods in a foreign country. Because of this, your affiant believes there is probable cause that KING ordered the firearm silencer over the internet.

25.     Based upon this affiant's training, experience, and discussions with other federal agents related to the investigation of international import-related violations, this affiant knows that the primary method for manufacturers to distribute to international customers is through the use of various online marketplace platforms such as eBay or other similar websites. This fact requires customers to utilize digital devices such as mobile phones, computers/laptops, and tablets to connect with and purchase the firearms and firearm accessories.

26.     Your affiant has been involved in numerous investigations involving the use of computers and cell phones, to include child pornography investigations. Because of this affiant's experience investigating these crimes, this affiant knows that computers retain information for extended periods of time and that even if the user deletes information, it can still usually be recovered using forensic software. Your affiant also knows computers retain information like internet browsing history for significant periods of time. Because of this, this affiant believes that there will be evidence related to the purchase of the firearm silencer and other firearms or firearm accessories on a computer or cell phone belonging to KING. This affiant believes that there are likely emails or other data confirming KING's order and payment to the shipper. Based on your affiant's training and experience, individuals purchasing firearms or firearm parts keep records of their purchases, which are likely to be in electronic form when the item is purchased over the internet.

27. Based upon my training and experience, and information relayed to your affiant by agents and others involved in the forensic examination of computers and digital devices, I know that electronic storage devices such as computers and mobile phones are often used to purchase from the internet and store information in very much the same way paper, ledgers, files, and file cabinets are used to store information. I know that it is common today for individuals to utilize digital devices to conduct their legal and/or illegal business and to store information related thereto. I know based on my training and experience, that subjects who are engaged in this illegal activity commonly store information related to their activities on digital devices.

28. Based on my training, knowledge and experience, and the experience of others with whom I have discussed this investigation, I know that the SUBJECT DEVICE has capabilities that allow it to serve as a wireless telephone, portable media player, GPS navigation device, and Personal Digital Assistant ("PDA"). In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## TECHNICAL TERMS

29. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from

the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the

model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include

various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

30.  *Forensic evidence.* As further described in Attachment B, this application seeks

permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the SUBJECT DEVICE was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the SUBJECT DEVICE because:

  a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

  b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

  c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

  d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other

evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

31. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the SUBJECT DEVICE consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

32. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is good cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

33.  Based on the foregoing, it is my belief that probable cause exists for the issuance of a warrant to search the device described in Attachment A and to seize the electronically stored information set forth in Attachment B.

34.  This affidavit has been reviewed by Assistant United States Attorney Martin L. Holmes.

Respectfully submitted,

HAILEY E BARRACO
Digitally signed by HAILEY E BARRACO
Date: 2023.11.07 09:26:12 -05'00'

Hailey Barraco
Special Agent
Homeland Security Investigations

SWORN TO ME VIA TELEPHONE OR
OTHER RELIABLE ELECTRONIC MEANS
AND SIGNED BY ME PURSUANT TO
FED. R. CRIM. P. 4.1 AND 4(d) OR 41(d)(3),
AS APPLICABLE

This __7th__ day of ___November___, 2023
Charleston, South Carolina

_____
The Honorable Molly H. Cherry
UNITED STATES MAGISTRATE JUDGE